# In the United States Court of Federal Claims

No. 24-554
Filed: August 28, 2024
Published: September 5, 2024[†]

---

**ISLAND CREEK ASSOCIATES, LLC,**

*Plaintiff,*

v.

**THE UNITED STATES,**

*Defendant.*

---

*John L. Holtz*, with *Shane J. McCall*, *Nicole D. Pottroff*, *Gregory P. Weber*, and *Stephanie L. Ellis*, Of Counsel, Koprince McCall Pottroff LLC, Lawrence, Kansas, for Plaintiff.

*Claire Horrell*, Trial Attorney, Commercial Litigation Branch, Civil Division, *William J. Grimaldi*, Assistant Director, *Patricia McCarthy*, Director, *Brian M. Boynton*, U.S. Department of Justice, Washington, D.C., for Defendant.[1]

### MEMORANDUM OPINION AND ORDER DISMISSING

**TAPP, Judge.**

Sympathy cannot confer standing. This principle remains true even in instances of seemingly unfair procurement practices. *See 22nd Century Techs., Inc. v. United States*, 57 F.4th 993, 999 (Fed. Cir. 2023) (iterating that judicial review is sometimes unavailable "even in the event of an agency's egregious, or even criminal, conduct."). Unless the plaintiff can show direct economic harm, post-award protests are for disappointed bidders who were unsuccessful in obtaining a contract. Once a multiple-award contract is awarded, recipients often lack the legal standing necessary to challenge the procurement process under this Court's bid protest jurisdiction.

---

[†] This Opinion was originally filed under seal on August 28, 2024, (ECF No. 34). The Court provided parties the opportunity to submit proposed redactions. In a Joint Status Report filed September 5, (ECF No. 36), the parties indicated that no redactions were required.

[1] Claire Horrell was counsel of record at the time of briefing and during Oral Argument held July 16, 2024. On July 25, Patrick Angulo filed a Notice of Appearance, (ECF No. 29), thereby terminating Ms. Horrell's involvement on the record. Because Ms. Horrell was counsel of record during briefing, her name appears in the introduction.

Here, the Court is presented with a post-award bid protest; pre-award rules that may allow the awardee-Plaintiff to proceed do not apply. Because the awardee-Plaintiff has not evinced a direct economic injury, it lacks requisite standing to proceed and the United States' Motion to Dismiss, (ECF No. 19), is granted. Further, during briefing and again after oral argument, Plaintiff moved for leave to amend its operative Complaint.[2] (ECF Nos. 25, 30). Finding that amendment would be futile, those motions are denied. Fellow awardees also moved to intervene after oral argument, (ECF No. 28); given the rulings herein, the Court denies those requests as moot.

## I.        Background[3]

SeaPort-NxG ("SeaPort") is the United States Navy's (the "Navy") electronic platform for acquiring support services in twenty-three functional areas including engineering, financial management, and program management. (Am. Compl. Ex. A at 7 (Original Seaport Contract's Statement of Work), ECF No. 8-1). Several subdepartments of the Navy may issue orders under SeaPort, such as Naval Sea Systems Command ("NAVSEA"), Naval Information Warfare Systems Command ("NAWCAD"), and Naval Air Systems Command ("NAVAIR"). (*Id.*). New contractors are added to this indefinite-duration, indefinite-quantity ("IDIQ") multiple-award contract ("MAC") periodically through a "rolling admissions" process. (*Id.* at 14 (C.11: "Rolling Admission")). Island Creek Associates, LLC ("Island Creek"), is an awardee of a SeaPort contract for engineering services, having begun performance in 2019.[4] (Am. Compl. at 4–5, ECF No. 8). Island Creek's protest centers on the Navy's modification to SeaPort which it perceives as giving an unfair advantage to mentor-protégé joint ventures ("JV") and their member companies. (*See generally* Am. Compl.).

### A.        Contract History

On February 14, 2018, the Navy issued Solicitation No. N0017818R7000. (Am. Compl. at 5). Among thousands of others, the Navy awarded SeaPort contracts to Island Creek, Precise Systems, Inc. ("Precise"), and Don Selvy Enterprises, Inc. ("DSE"). (*Id.*). Upon becoming active contract holders on January 2, 2019, Island Creek, DSE, and Precise also became eligible to compete for task orders solicited under the overarching SeaPort contract. (*Id.* Ex. A (Original SeaPort Contract) at 7 (C.1–2 ("Scope" and "Applicable Documents")))).

The original SeaPort Solicitation terms stated under Section C.10.2: "One Prime Contract Per Company: 'Company' includes affiliates and business units as defined in FAR 2.101, this also includes Joint Ventures. This rule does not prevent the affiliated company from being able to participate in SeaPort-NxG." (*Id.* (Original SeaPort Contract) at 14). Section C.12 of the

---

[2] Island Creek filed its first Complaint on April 10, 2024, (ECF No. 1). Six days later, it filed its First Amended Complaint to add exhibits, (Am. Compl. ECF No. 8).

[3] Because of the early stage of litigation, the United States has not filed the administrative record. Therefore, these findings are from the operative Complaint, (ECF No. 8), which the Court construes as true, and attachments therein.

[4] Indefinite Delivery Contract No. N0017819D7896. (Am. Compl. at 5).

original SeaPort terms upon award in 2019 stated that "Joint Ventures would be considered an affiliate in accordance with the Affiliates rule." (*Id.* at 15).

These terms were modified. Under Mass Modification 5, Section C.10.3, entitled "Joint Ventures (JVs)," was added to the MAC, clarifying that a JV may not hold a Prime MAC at the same time as its members. (Am. Compl. Ex. B (SeaPort Mass Mod. 5) at 18, ECF No. 8-2).

> A Joint Venture and individual partners in the Joint Venture can only hold one SeaPort NxG MAC. If one partner of the Joint Venture holds a Prime MAC contract, then the Joint Venture entity cannot also hold a subsequent Prime MAC contract. Members of the Joint Venture must decide which – the Joint Venture or the individual partner - would be the Prime MAC holder.

> Contractors are cautioned that if a Joint Venture holds a SeaPort NxG MAC and that Joint Venture relationship dissolves, the MAC does not automatically transfer to one of the remaining partners. A novation agreement must be processed through the cognizant DCMA office.

On January 4, 2024, the Agency issued another modification. (*Id*. Ex. U (Jan. 4 Mass Mod.), ECF No. 8-21). This modification carved out an exception to the rule of one contract per company:

> The only exception to the one contract per company rule is in the case of a firm that has an SBA-approved mentor-protégé agreement authorized under 13 CFR § 125.9. For [mentor-protégé program ("MPP")] JVs, the mentor, protégé, and JV can each hold a MAC. Partners within the JV are allowed more than one MPP JV MAC within the SeaPort program provided the additional mentor-protégé relationships have been approved by the SBA and the related MPP JVs do not compete against each other for particular task orders. *See* 13 CFR § 125.9.

(*Id*. at 15 (C.10.2 – One Prime Contract per Company)). That same modification also adjusted language on joint ventures to read:

> A Joint Venture (other than MPP JVs) may not hold a SeaPort NxG MAC if a partner within the Joint Venture entity also holds a Prime MAC. In other words, if one partner of the Joint Venture holds a Prime MAC contract, then the Joint Venture entity cannot also hold a subsequent Prime MAC contract. Members of the Joint Venture must decide which – the Joint Venture or the individual partner - would be the Prime MAC holder. Nothing in this paragraph prevents more than one partner within a Joint Venture entity from each holding a Prime MAC contract where such arrangement is otherwise permitted under C.10.2 of this section.

(*Id.* (C.10.3 – Joint Ventures)).

B.      *Post-Modification Litigation*

In this bid protest, Island Creek claims that the Navy "has essentially changed eligibility rules" for holding a SeaPort contract "well after initial proposals were timely submitted for the Solicitation—and after many orders have already been awarded thereunder." (Am. Compl. at 2). Specifically, it did so by amending "SeaPort in such a manner as to create a situation where eligibility requirements . . . are now unduly restrictive and favor certain contract holders and even some non-contract holders, all without reasonable justification[.]" (*Id.* at 3). Stated differently, before the modification, joint ventures had not been allowed to hold SeaPort contracts if any of their members also held a contract. That restriction remains in place for all other joint ventures *except* for mentor-protégé firms. (*See id.*).

Island Creek states that there is evidence of an organizational conflict of interest ("OCI") that led to this modification. (*Id.* at 26–27). Specifically, Jeff Guarnero "Deputy Department Head for Aircraft Support Contracts for NAVAIR," apparently serves as the "head of NAWCAD Procurement Group" and is married to Diana Sovine, a program manager for Precise, an incumbent awardee that began performance in 2019.[5] (*Id.* at 26). Precise and DSE entered into a mentor-protégé agreement in September 2022 and the next month created a joint venture called Secise, LLC ("Secise"). (*Id.* at 16). Island Creek argues that various task order terms were designed to give Precise preferential treatment, specifically related to size standards, and the most recent amendments favor awarding additional contracts to Secise.[6] (*Id.* at 27).

Island Creek filed this bid protest raising five counts. First, it alleges that the Navy violated FAR 1.602-2(b) by amending the SeaPort contract to allow mentor-protégé joint ventures to hold multiple SeaPort contracts, providing them with an unfair advantage. (Am. Compl. at 22). Island Creek also claims that the Navy's modifications amount to preferential treatment, a violation of FAR 3.101-1. (*Id.* at 23). Next, Island Creek alleges that the Navy's actions are inconsistent with FAR 16.505(b)(1) by allowing awards to non-IDIQ holders, specifically benefiting mentor-protégé joint ventures and their component members. (*Id.* at 24). Furthermore, Island Creek advances that the Navy failed to conduct a proper OCI analysis and mitigation as required by FAR 9.504 and 9.506. (*Id.* at 25–26). Finally, Island Creek alleges that the amendment to the SeaPort contract is unduly restrictive and favors certain offerors without justification, specifically mentor-protégé joint ventures. (*Id.* at 27–28).

---

[5] Island Creek goes on to state its understanding that "Sovine retired, and there was private talk of her retiring prior to the modification, but, considering its concerns about transparency here, Island Creek will need the record to confirm the timeline of events as to whether she did retire." (Am. Compl. at 7 n.5).

[6] Island Creek cited this size dispute during oral argument and within briefing. (Pl.'s Resp. at 13, ECF No. 23; OA Tr. at 8:3–13, 10:22–25, 11:2–16, ECF No. 32). However, Island Creek also admits that any size dispute falls outside the scope of this Court's jurisdiction. (Am. Compl. at 13 n.13 ("Island Creek is aware that the time for a protest of the terms of PM CSS MAC RFP has passed. It simply notes these issues as evidence of how contract language has been crafted in a manner to favor Precise.")).

### C.        Notice of Corrective Action

As part of the Navy's voluntary stay, the Navy halted the implementation of the subject modifications to the SeaPort MAC. (Notice of Corrective Action, ECF No. 18). Additionally, the Navy paused the issuance of new MAC awards. (*Id.* at 1). Per the United States' Notice of Corrective Action, the Navy "now intends to make permanent the suspension of the January 4, 2024 modifications by reversing the modifications to sections C.10.1, C.10.2, and C.10.3 of the MAC, thereby reinstating the prior definition of 'Affiliates,' removing the mentor-protégé exception to the one contract per company rule, and reverting to the previous language concerning joint ventures." (*Id.*).

## II.        Analysis

Before establishing a briefing schedule on the Administrative Record, the United States sought to dismiss. Accordingly, the merits of Island Creek's claims are not before the Court; thus, the Court will not address whether the Navy's decision to modify the underlying contract was arbitrary and capricious. The United States asserts that the Court lacks jurisdiction over Island Creek's protest. (Def.'s Mot. at 7–16, ECF No. 19). The United States advances that this protest is either moot due to corrective action or pertains to post-award contract administration, necessitating resolution through the Contract Disputes Act ("CDA"). (*Id.* at 10–12). Additionally, the United States argues that this protest is barred by the Federal Acquisition Streamlining Act ("FASA"), and, importantly, that Island Creek lacks standing to bring the protest. (*Id.* at 13–18). For its part, Island Creek vehemently advances inverse arguments, generally arguing that "this case must move forward *at least* to a stage where this Court can see a full procurement record and ensure that justice, the rule of law, and fairness are being upheld." (*See generally* Pl.'s Resp. at 7, 15–27). The Court finds that Island Creek lacks standing because it is a SeaPort awardee who cannot show direct economic harm, the United States' Motion to Dismiss is granted.[7]

---

[7] Given this ruling, the Court will not address the United States' remaining arguments. However, it would be remiss to ignore Island Creek's strenuous objections as to whether this protest is mooted based on the purported corrective action. (Pl.'s Resp. at 6, 19). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). Where the challenged conduct has ended because of a defendant's voluntary cessation, "subsequent events [must make] it absolutely clear that the allegedly wrongful behavior [can]not reasonably be expected to recur." *Friends of the Earth, Inc., v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 189 (2000) (quoting *United States v. Concentrated Phosphate Exp. Ass'n.*, 393 U.S. 199, 203 (1968)). A defendant's voluntary cessation of allegedly illegal conduct renders a case moot when (1) there is no reasonable expectation that the alleged violation will recur, and (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *SEKRI, Inc. v. United States*, 165 Fed. Cl. 21, 36 (2023) (citing *Cnty. of L.A. v. Davis*, 440 U.S. 625, 631 (1979)); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future

A.      *Standing*

Under RCFC 12(b)(1), "a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). If at any time the court determines that it lacks subject-matter jurisdiction, it must dismiss the action. RCFC 12(h)(3); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). Plaintiffs bear "the burden of establishing subject matter jurisdiction by a preponderance of the evidence." *Estes Express Lines v. United States*, 739 F.3d 689, 692 (Fed. Cir. 2014) (citation omitted). "Subject-matter jurisdiction may be challenged at any time." *Folden v. United States*, 379 F.3d 1344, 1354 (Fed. Cir. 2004). Federal courts are confined to resolve "cases" and "controversies." U.S. Const. art. III. In turn, plaintiffs are required to demonstrate standing. *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008); *see also Dep't of Com. v. New York,* 588 U.S. 752 (2019) ("For a legal dispute to qualify as a genuine case or controversy, at least one plaintiff must have standing to sue."). Courts have a "virtually unflagging obligation" to exercise jurisdiction if standing exists. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).

In establishing jurisdiction, a plaintiff bears the burden to prove all elements of standing. *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Owing to its necessity, standing is a threshold question in every case. *Lujan*, 504 U.S. at 561. The United States Supreme Court has held that the "irreducible constitutional minimum" of standing contains three elements; a plaintiff must allege facts showing that it: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan*, 504 U.S. at 560). "Article III standing requires a concrete injury even in the context of a statutory violation. For that reason, [a plaintiff] could not, for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Id.* at 341. The plaintiff "bears the burden of establishing standing as of the time [it] brought th[e] lawsuit and maintaining it thereafter." *Carney v. Adams*, 592 U.S. 53, 59 (2020). "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.

When the Court hears a bid protest, it "appl[ies] the appropriate [Administrative Procedure Act ("APA")] standard of review" as delineated in 5 U.S.C. § 706. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985). "The APA provides standing almost to the limits of Article III, as follows: '[a] person . . . adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.'" *Aero Spray, Inc.*

---

injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." (internal quotation marks omitted)). The Court points this out not for any meritorious ruling but to note that neither "[p]laintiffs nor the Court need accept on faith the effect of a vague corrective action proposal." *AccelGov, LLC v. United States*, 166 Fed. Cl. 606, 610 (2023). Consequently, ruling on mootness in these circumstances requires the Court to scrutinize proposed corrective action to ensure adequacy.

*v. United States*, 156 Fed. Cl. 548, 558 (2021) (quoting 5 U.S.C. § 702). However, the standing inquiry in bid protests is complicated by the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870, defining "not only this Court's jurisdiction over *what* actions may be brought against the government, but also *who* has standing to pursue them." *Id.* at 559 (emphasis in original).

In addition to the requirements of standing imposed by Article III, government procurement protestors must satisfy the standing requirements of the Tucker Act, which are even more stringent. *Wks. Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009) (discussing 28 U.S.C. § 1491(b)(1)). Importantly, under 28 U.S.C. § 1491(b)(1), a protestor must "establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest." *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006). The second prong queries whether a protestor had a "substantial chance" to receive the contract award but for the "alleged" procurement process error. *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003). The question is whether, "if successful on the merits of [its] bid protest[,]" the protestor would have had a substantial chance of securing the contract." *Id.* However, there are exceptions in pre-award protests. *Yang Enters., Inc. v. United States*, 156 Fed. Cl. 435, 444–45 (2021). The Federal Circuit has recognized that when a prospective bidder is challenging a solicitation before the agency makes an award, there is often "no factual foundation for a 'but for' prejudice analysis." *Wks. Marine*, 575 F.3d at 1361. When that is the case—as it commonly is in pre-award protests—the Court must consider whether the protestor can demonstrate a "non-trivial competitive injury which can be addressed by judicial relief." *Id.* at 1362; *see also Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1382 (Fed. Cir. 2012). Alternatively, when an "adequate factual predicate" exists such that the Court can determine whether the protestor had a "substantial chance" to receive the award, the general rule applies. *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1349 (Fed. Cir. 2013); *see also Oracle Am., Inc. v. United States*, 975 F.3d 1279, 1291 n.3 (Fed. Cir. 2020).

The United States and Island Creek disagree about what standard to implement in this protest—the more stringent post-award standard, or the more inclusive pre-award standard. The United States believes that because Island Creek has already been awarded a SeaPort contract "it therefore lacks standing to object to the award of other SeaPort NxG contracts or to the award of task orders under the MAC[.]" (Def.'s Mot. at 16). The United States specifically posits that "[t]o be an actual or prospective bidder, a plaintiff must not be a contract holder." (*Id.* at 17 (citing *Outdoor Venture Corp. v. United States*, 100 Fed. Cl. 146, 152 (2011) ("Once a bidder has received a contract, it is no longer an actual or prospective bidder or offeror with regard to the particular procurement. Instead, the bidder has become an awardee, who is not an interested party for purposes of 28 U.S.C. § 1491(b)(1)[.]")); *Trailboss Enters., Inc. v. United States*, 111 Fed. Cl. 338, 340 (2013) ("Where the plaintiff is the awardee of the contract . . . it no longer has standing under Section 1491(b)(1) as an interested party for the purpose of challenging the terms of the award.")).

Island Creek disagrees with the United States, urging the Court to implement the pre-award standard. (Pl.'s Resp. at 27–29). In support, Island Creek argues that "[t]he nature of this protest is one where it is essentially what would otherwise be a pre-award protest that (by necessity) could only be brought post-award, as it concerns what are essentially terms of the Solicitation." (*Id.* at 27). It goes on to state that "[t]his is a case where the government has

7

essentially somehow modified the terms of the solicitation after the fact in furtherance of supporting an OCI." (*Id.* at 29). Island Creek also argues that "not finding standing here would essentially leave contractors without recourse when an agency changes IDIQ language that affects the award pool without any competitive procedures." (*Id.*).[8]

There is an apparent disagreement among judges of this Court as to whether a pre-award standard should ever apply in this post-award landscape. *See Nat'l Air Cargo Grp., Inc. v. United States*, 126 Fed. Cl. 281 (2016) (Lettow, J.) (allowing awardee in MAC IDIQ procurement to challenge other awards under the theory that the other, allegedly improper, awards would increase competition and thereby decrease the awardee's likelihood of receiving future task orders under its IDIQ contract); *but see Aero Spray,* 156 Fed. Cl. 548 (Solomson, J.) (holding awardee in MAC IDIQ procurement lacked standing to challenge other awards because awardee is no longer an actual or prospective bidder). In furtherance of its position, Island Creek cites *National Air Cargo Group*. (Pl.'s Resp. at 21, 28–29 (citing 126 Fed. Cl. 281)). There, after receiving one of the initial five awards under an IDIQ solicitation, the plaintiff-awardee challenged a sixth award on the basis that the agency "violated terms of the solicitation limiting awardees," violated applicable statutes and regulations, and acted irrationally given the sixth awardee's past performance record. *Nat'l Air Cargo*, 126 Fed. Cl. at 284. In addressing the United States' motion to dismiss based on a lack of standing, Judge Lettow determined that the plaintiff had sufficiently demonstrated standing by alleging a non-trivial competitive injury stemming from increased competition due to the sixth award. *Id.* at 295. In so holding, Judge Lettow applied the pre-award standing test from *Weeks Marine* because the plaintiff "did not seek a contractual award but instead [sought] to remedy an alleged violation of procurement law that has affected the task order pool." *Id.* at 295 (applying "non-trivial competitive injury" test).

In 2020, *Aero Spray* deviated from the logic of *National Air Cargo*. 156 Fed. Cl. at 571–575 ("This Court is not persuaded to follow *National Air Cargo* for several reasons."). In *Aero Spray*, an awardee of an IDIQ contract for amphibious firefighting aircrafts challenged the government's decision to award similar contracts to its competitors. *Id.* at 552. The United States and the intervenor moved to dismiss the case, arguing, among other things, that the contractor lacked standing to bring the protest. *Id.* The Court granted the defendants' motions, finding that the contractor was not an actual or prospective offeror for the competitor contracts and did not suffer direct economic harm from the other awards. *Id.* at 567. Judge Solomson held that "[t]he likelihood of increased competition may constitute an injury in fact for Article III purposes, but it does not follow that Aero Spray's 'direct economic interest' is impacted by the other awards." *Id.* at 574. Judge Solomson found that, due to the nature of IDIQ contracts, awardees have no legally cognizable expectation of receiving future task orders but only a "guaranteed a minimum quantity of orders and a fair opportunity to compete for future task orders." *Id.* at 569 (citing FAR 16.505(b)).

---

[8] The possibility that no one could challenge a particular action does not confer standing. Courts have held that the absence of other potential litigants cannot serve as a basis for standing. *See Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974) ("[t]he assumption that if [plaintiffs] have no standing to sue, no one would have standing, is not a reason to find standing.") (citing *United States v. Richardson*, 418 U.S. 166, 179 (1974)).

*Aero Spray* distinguishes its facts from cases where "awardee[s] w[ere] found to have standing to protest that [they] had a 'substantial chance' of being awarded a more valuable contract" rather than faced with the threat of increased competition in future task order awards. *Id.* at 574 (citing *PAE-Parsons Glob. Logistics Servs., LLC v. United States,* 145 Fed. Cl. 194, 199–200 (2019) (where government concurrently awarded four "very different" IDIQ contracts, the court concluded that because the protestor was awarded a lower priority IDIQ contract, the plaintiff "clearly has standing as a disappointed bidder with regard to the IDIQ contract award at issue in this case"), and *Sirius Fed., LLC v. United States*, 153 Fed. Cl. 410, 419 (2021) (distinguishing cases involving "challenge[s] [to] terms of existing contracts rather than challenging an award decision" but finding standing when plaintiff-awardees "are specifically alleging error in the [g]overnment's evaluation and award decisions that prevented them from obtaining separate awards.")). Island Creek's claims are distinguishable on the same grounds. Here, there is no allegation that the awards differ substantively or that there is a misstep in evaluation or award decision. (*See generally* Am. Compl.). Rather, the source of Island Creek's claims is that an OCI resulted in increased competition, harming its interests as a MAC awardee. (*Id.*; *see also* OA Tr. 29:1–5 (Island Creek: [T]here are so many things that have happened that it got to the point now where we were able to say . . . we are seeing direct motions of . . . multiple task [orders] happening here; motions all that are moving in favor of this OCI.), ECF No. 32).

Although this Court shares Island Creek's concern, not every OCI-related injury falls within the purview of a bid protest. As *Aero Spray* recognized, increased competition, while potentially constituting an Article III injury, does not necessarily equate to a direct economic harm redressable through a bid protest. 156 Fed. Cl. at 574 ("The likelihood of increased competition may constitute an injury in fact for Article III purposes, but it does not follow that . . . 'direct economic interest' is impacted by the other awards[.]"). Further, *National Air Cargo* is contextually distinguishable as it involved the addition of one awardee in a pool of six. 126 Fed. Cl. at 284. Here, however, the increased competition is, by Island Creek's own characterization, negligible as this MAC affects "thousands of . . . small businesses." (Pl.'s Reply at 30; *see also* OA Tr. 17:12–15 (DOJ: The SeaPort MAC involves thousands of contract holders and the addition of potentially one more in a pool of 2,500 is not as significant as the addition of one in a pool of six.)).

Island Creek argues that the Court's recent ruling in *Point Blank Enterprises v. United States*, 168 Fed. Cl. 676 (2023), mandates that the administrative record must be developed here to "clear the air of the OCI pollution[.]" (Pl.'s Resp. at 15). However, its reliance on *Point Blank* is misplaced.[9] At Oral Argument, Island Creek argued that *Point Blank* discusses "an OCI kind of having a special place because it is something that underlies the entire contract. And in this case, I think it's especially important because we've yet to have a record; we've yet to have our [Motion for Judgement on the Administrative Record ("MJAR")]; and we've yet to see the

---

[9] Island Creek argues that "*Point Blank* was a case challenging an IDIQ OCI affecting the award of a task order." (Pl.'s Resp. at 18). That is incorrect; *Point Blank* did not involve the award of a task order. *See* 168 Fed. Cl. at 678. This confusion is caused by a scrivener's error based on documents referencing a task order attached to the protestors' sealed complaint. The error has been corrected and an amended Opinion issued. *Id.* (removing reference to task order).

record from the agency." (OA Tr. at 5:16–22). However, neither *Point Blank* nor any other precedent establishes that an OCI triggers distinct standing rules. *See generally* 168 Fed. Cl. 676. *Point Blank* is distinguishable from this case because it involved a different procedural posture and contractual context. *Id.* There, standing was not in dispute and the contract was not a MAC. *Id.* Thus, the ruling in *Point Blank* is inapplicable here.

The Court concurs with the reasoning and analysis presented in *Aero Spray*. Ultimately, Judge Solomson held that "[b]y definition, an IDIQ contract awardee . . . cannot be an actual or prospective offeror with respect to another IDIQ contract awarded under the same solicitation" based on "the simple fact that a contractor that has already been awarded an IDIQ contract cannot be awarded additional IDIQ contracts, even if it could show flaws in the agency's award of those contracts." *Aero Spray,* 156 Fed. Cl. at 569–70 (implementing precedent used by Government Accountability Office). Like in *Aero Spray,* this Court relies on *Systems Application* where the Federal Circuit rejected utilization of the "substantial chance" test beyond the post-award context. *Sys. Application & Techs., Inc.*, 691 F.3d at 1385. Notably absent from this ruling is any suggestion that the more lenient pre-award standard could apply in post-award protests where a plaintiff has already secured a contract. *See generally id.* Moreover, "nothing in *Weeks Marine* or *Systems Application* demonstrates that the relevant 'direct economic interest' may include future competitions for task orders, as opposed to the contract award sought." *Aero Spray*, 156 Fed. Cl. at 571–72. As Judge Solomson succinctly stated, "the 'non-trivial competitive injury' is an injury suffered in the competition for the contract(s), not something arising from the award(s)." *Id.* at 572.

Further, any potential harm to Island Creek is more appropriately addressed through alternative avenues. Depending on the characterization of the claims, Island Creek could possibly seek relief through its contracting officer, a CDA claim, or FASA procedures. When a contractor challenges a change to its own contract, that claim is not a bid protest and must be brought under the CDA instead. *See Magnum Opus Techs., Inc. v. United States,* 94 Fed. Cl. 512, 526 (2010); *see also Harmonia Holdings Grp., LLC v. United States,* 157 Fed. Cl. 292, 301 (2021) (rejecting a contract holder's reliance on *Magnum Opus* to establish bid protest jurisdiction over a challenge to an agency's change to a certification process in existing IDIQ MAC). Therefore, if the alleged injury stems from the administration of its own MAC, the CDA provides the proper procedural vehicle. Conversely, if harm arises from task order awards, FASA requires the awardee to seek an administrative remedy. *See 22nd Century Techs.*, 57 F.4th at 999. However, no characterization of Island Creek's claims can plausibly confer standing to position this case within the scope of this Court's bid protest jurisdiction. 28 U.S.C. § 1491(b)(1). As it stands, even if Island Creek were successful on the merits of its claims "it would not result in further IDIQ contract awards to" Island Creek. *See Aero Spray*, 156 Fed. Cl. at 570. Because standing also requires a plaintiff to show that an injury would be redressable by a favorable ruling, Island Creek fails on this ground as well. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

The policy rationale for precluding post-award bid protests by MAC awardees under these circumstances is compelling. Such protests can lead to protracted litigation, undermining efficient contract administration. Moreover, allowing existing awardees to challenge eligibility modifications that expand competition can disrupt the carefully balanced competitive environment established by the award process. The government's flexibility to adjust contract

terms in response to evolving needs is essential to effective procurement. Permitting post-award challenges to these modifications could deter future participation in MACs and ultimately harm the government's ability to acquire necessary goods and services. Accordingly, it is sound public policy to limit post-award bid protest standing to actual or prospective offerors who were unsuccessful in obtaining a contract and can show direct economic harm.

The Court finds that Island Creek, as a SeaPort awardee, is not an actual or prospective offeror and cannot show direct economic injury; thus, it does not meet the essential criteria for bringing a post-award protest. Because Island Creek lacks the requisite standing to pursue its claims, the United States' Motion to Dismiss is granted.

### B.    Miscellaneous

Island Creek has moved twice to supplement its pleadings. (ECF Nos. 25, 30). First, it moved to supplement its original Complaint with "a sworn declaration from the Island Creek representative that was present and has first-hand knowledge" of statements made by DSE's president stating that "the use of a non-[SeaPort] contracting holding MPJV was still allowed despite NAVSEA rescinding the January 2024 amendment in May 2024." (ECF No. 25). The United States objects on several grounds including timeliness, relevance, and hearsay. (ECF No. 27). Island Creek's second motion wishes to add: "(1) information and documentation responsive to a question posed by this Court in oral arguments on dismissal; (2) a brief response to the Department of Justice's claim upon which dismissal is requested—that there is no longer a procurement law violation at issue in this case; and (3) a brief explanation of the recent decision by this Court in *Percipient.AI, Inc. v. United States, CACI, Inc.-Fed.*, 104 F.4th 839 (Fed. Cir. 2024)[.]" (ECF No. 30). The United States objects to this request as well, suggesting it is a vehicle to introduce a sur-reply to the pending dismissal motion. (ECF No. 33).

Whether a court grants or denies a motion for leave to amend a complaint falls within its discretion, and a court "ought to exercise liberally its discretion to grant leave to amend." *Wolfchild v. United States*, 101 Fed. Cl. 54, 64 (2011), *aff'd in part, rev'd in part on other grounds*, 731 F.3d 1280 (Fed. Cir. 2013). Courts "should freely give leave when justice so requires." RCFC 15(a)(2). In *Foman v. Davis*, the Supreme Court articulated reasons that warrant denial of leave to amend: (1) undue delay, (2) bad faith or dilatory motive on the part of the movant, (3) repeated failure to cure deficiencies by amendments previously allowed, (4) undue prejudice to the opposing party by allowance of the amendment, and (5) futility. 371 U.S. 178, 182 (1962). It is only the final reason at play here. A court may deny a motion to amend a complaint based on futility if, for example, the claim added by the amendment could not withstand a motion to dismiss. *See Slovacek v. United States*, 40 Fed. Cl. 828, 834 (1998) (citing *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 292 (3d Cir. 1988)). There is simply no cure for Island Creek's critical standing deficiencies in this case. It follows that any such amendment would be futile. Therefore, its motions to amend the operative pleading are denied.

Finally, Precise and DSE moved to intervene in this case on July 22, 2024. (ECF No. 28). Their motion explains that they "learned that they were identified in this complaint, and of the nature of the complaint, only when a redacted version of the complaint was filed and made available to them on June 27, 2024." (*Id.*). Given the Court's rulings, such intervention would be for naught. Thus, Precise and DSE's joint Motion to Intervene is denied as moot.

### III.     Conclusion

Standing is a necessary element for a court to exercise subject matter jurisdiction; here, it does not exist. For the reasons stated above, the United States' Motion to Dismiss, (ECF No. 19), is **GRANTED**. Based on this ruling, Precise and DSE's Motion to Intervene, (ECF No. 28), is **DENIED** as moot. Because amendment of Island Creek's Complaint would be futile, its motions to amend, (ECF Nos. 25, 30), are **DENIED**.

The Clerk is **DIRECTED** to enter judgment accordingly. The parties shall meet and confer and file a Joint Status Report proposing redactions to this memorandum opinion within fourteen (14) days of its entry to allow the Court to file a public version of the opinion.

**IT IS SO ORDERED.**



s/      David A. Tapp
DAVID A. TAPP, Judge